UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

Brandon Scroggin                    )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )     CASE NO. 312-CV00128-SWW
                                    )
Credit Bureau of Jonesboro Inc.)
                                    )
        Defendant                   )

---

VIDEOTAPED ORAL DEPOSITION

OF

BRANDON SCROGGIN

(Taken March 2nd, 2013, at 9:53 a.m.)

---

SUZANNE VEACH, CCR
VEACH REPORTING SERVICES
2312 SEA ISLAND DRIVE
JONESBORO, AR 72404
(870)974-1655
dsveach@gmail.com

Exhibit 1-Page 1

5

1                              **PROCEEDINGS**

2    THEREUPON,

3                          BRANDON SCROGGIN,

4        THE WITNESS HEREINBEFORE NAMED, having been first duly

5    cautioned and sworn by me to testify to the truth, the whole

6    truth, and nothing but the truth, testified on his oath as

7    follows, to-wit:

8                              **EXAMINATION**

9    BY MS. WORSHAM:

10   Q    Hi, Brandon.

11   A    Hello.

12   Q    Mr. Scroggin, my name's Rebecca Worsham and I represent

13   the Credit Bureau of Jonesboro.

14   A    Okay.

15   Q    And I'm at the Mixon Law Firm.  And we're here today to

16   take your deposition.

17   A    Okay.

18   Q    Have you ever taken a deposition before?

19   A    No, ma'am.

20   Q    Okay.  Well, in a deposition, I'm gonna ask you a series

21   of questions concerning the lawsuit.  It'll be -- basically,

22   I'm trying to find out what you're gonna say at trial.

23   A    Okay.

24   Q    If you don't know an answer to something, just say you

25   don't know.  If you don't understand one of my questions, just

Exhibit 1-Page 2

6

1    say, "Hey, I -- can you repeat that?  I don't understand," and

2    I can rephrase it.  And before the deposition can be used in

3    court, you'll have the opportunity to review it.

4         And do you understand that you have the obligation to

5    tell the truth and --

6    A    Uh-huh.

7    Q    Okay.  And -- let's see.  I'm first gonna ask you just

8    some housekeeping matters.  This isn't to offend you.

9    A    Okay.

10   Q    Are you under the influence of any type of prescription

11   drugs that would affect your ability to answer?

12   A    No.

13   Q    Is there anything happening in your personal life right

14   now that would affect you to tell the truth?

15   A    No.  Uh-huh.  Uh-huh.

16   Q    Okay.

17   A    No.

18   Q    All right.  Well, how about you start off by stating your

19   full name for the record?

20   A    Doyle Brandon Scroggin.

21   Q    And where are you currently living?

22   A    Jonesboro.

23   Q    Okay.  What's your date of birth?

24   A    10/15/72.

25   Q    And where are you originally from?

Exhibit 1-Page 3

9

1    A    Oh, about three and a half years.

2    Q    Okay.  Why did you leave that job?

3    A    Money.

4    Q    Where did you go after that?

5    A    Progressive Insurance Company.  Claims adjuster.

6    Q    How long did you do that for?

7    A    Two years.

8    Q    Where did you --

9    A    Little Rock.

10   Q    Little Rock?

11   A    Uh-huh.

12   Q    And where did you go after that?

13   A    Safeco Insurance Company in August of 2000.

14   Q    And how long did you do that for?

15   A    Til, I think, March or April of 2010.

16   Q    And why did you leave there?

17   A    Because the company shut down.  Well, the company didn't

18   shut down.  The company was bought out.

19   Q    And that was in March of 2010?

20   A    Oh, when the company was bought out?

21   Q    No.  When did you stop work there?

22   A    Oh, oh.  When did I start working there?

23   Q    Stop.

24   A    Oh, stop?  I wanna say February or March of 2010.

25   Q    Okay.  And then after that where did you work?

Exhibit 1-Page 4

1   Q   Okay.  Are you married?

2   A   No.

3   Q   Have you ever been married?

4   A   Yes.

5   Q   And what was your spouse's name?

6   A   Jacie, J-A-C-I-E.  Pruitt was her maiden name.

7   Q   And when did you two marry?

8   A   August 2nd, 1997.

9   Q   And when did you divorce?

10  A   Probably the middle of January in 2003.

11  Q   Why did y'all divorce?

12  A   Because she went to Nashville and had a threesome with

13  another guy and her boyfriend and didn't invite me to come

14  along.  I kind of wanted to be there for that.

15  Q   Okay.

16  A   Yeah.  So that's -- anyway.

17  Q   Okay.

18  A   So I didn't take to kindly to that so I went ahead and

19  filed for divorce and she didn't really dispute it so --

20  Q   So it was an uncontested divorce?

21  A   Yeah.  Yeah.

22  Q   Did y'all have any children?

23  A   No.  Huh-uh.

24  Q   No?  And do you have any other children or --

25  A   No.

Exhibit 1-Page 5

30

1  Q   Okay.

2  A   It is what it is.

3  Q   So during this time, did you know which time they were

4  referring to in that debt; that -- one of the emergency room

5  visits?

6  A   I assumed.  I assumed.  But I figured it was one of the

7  three.

8  Q   And which one did you think it was.

9  A   One of the two times that I left without being seen.  But

10  it could have been any of the three.

11  Q   So you -- did you believe it was the time when you passed

12  it while you were laying on the floor or the time you passed

13  it while you were in the bathroom?

14  A   Yeah.  But, I mean, it didn't really matter.  I mean, it

15  was one of the three times.  But I thought, I assumed, that it

16  was one of the two times that I wasn't officially seen.  Yeah.

17  Q   Okay.  Now, in this letter, you specifically use the

18  words *refuse to pay the debt*.

19  A   Right.  I wanted to make sure I used the statutory

20  language of the FDCPA so there wasn't any confusion.

21  Q   Okay.  So you consider yourself pretty knowledgeable of

22  the --

23  A   Oh, absolutely.  Yeah.  Yeah.  I doubt there's anybody

24  that isn't a lawyer that knows any more about the FDCPA in the

25  country than I do.

Exhibit 1-Page 6

69

1 | medical bills from that time forward.

2 | Q    In other words, my client's violation did not cause you

3 | to go to the doctor to seek help for your anxiety?

4 | A    Well, I didn't go to the doctor.

5 | Q    Okay.

6 | A    I wanted to but I didn't go.

7 | Q    Now, besides the National Loan Recovery suit, have you

8 | been involved in any other lawsuits?

9 | A    Yeah.

10 | Q    What are those?

11 | A    I sued the Grove Apartment Complex because what happened

12 | was I moved out and me and the apartment manager, we were

13 | having sex all the time in the model apartment.  And, I mean,

14 | I would send her, like, a text message or whatever.  And we

15 | would meet up in the model apartment or whatever.  Just, you

16 | know, friends with benefits-type thing.

17 | Q    Nice.

18 | A    Yeah.  And so she got mad at me when I cut her off

19 | because I got a girlfriend and she thought that I should keep

20 | on banging her while I had a girlfriend and I'm not that way

21 | because I had that done to me.

22 |     And so when I got ready to move out, it's my opinion I

23 | left the apartment in what I would call reasonable, normal

24 | wear and tear.  You should have seen the list, you know, where

25 | they send you whatever.  Close to $3,000 -- what they were

Exhibit 1-Page 7

1  doing.  They had $5 extra for nails and stuff.  $3 extra to

2  clean the glass.  Things like that.

3      There was a stain on the carpet.  Whatever.  I had a dog

4  that had diarrhea in there and it did stain the carpet just a

5  little bit but they wanted the whole carpet replaced for just

6  a little bit of a dog doo right over there.  And I wasn't

7  having any of it.

8      So what they did was, they turned me over to a collection

9  agency and -- but, guess what?  Their collection agency was

10  them but they just went under a different name.  They called

11  themselves whatever their real name is and guess who the debt

12  collector was?  Her.  So the girl that I'm banging in the

13  apartment, she's now the debt collector and so she's sending

14  me -- first off, she sends me all this notice.

15      I send her back a dispute; asked for debt validation.

16  She sends me back whatever.  And then she sends me a letter

17  saying -- within the 30-day time frame that I have 10 days to

18  pay up or they're gonna turn me over for a lawsuit.  That

19  overshadowed the 10 days that we were talking about up here.

20  Q    And you knew that?

21  A    Oh, yeah.  Yeah.

22  Q    And when was that approximately?

23  A    That was in 2009.  So I wasn't having any of that.  So I

24  immediately -- boom -- went straight to the courthouse on that

25  and sued them for overshadowing.

Exhibit 1-Page 8

1    Q   So you went right away?

2    A   For overshadowing. Yeah. I sued her personally, which,

3    I'm gonna do the debt collector that called me. We're gonna

4    join her. And then I sued her personally and I sued The Grove

5    under vicarious liability for having a debt collection agency

6    under them and I sued the debt collection agency in their name

7    and I sued her personally for overshadowing and not being

8    licensed.

9    Q   Now, you sued her personally --

10    A   Uh-huh.

11    Q   -- for overshadowing and not being licensed?

12    A   Yeah. I sued her as the debt collector and The Grove.

13    And this was before the Arkansas Fair Debt Collection Agency

14    Act.

15    Q   Uh-huh.

16    A   So I just sued them for FDCPA violations.

17    Q   And did that case settle?

18    A   Oh, yeah. Yeah. Your client's the only one that --

19    well, no, National Recoveries. But that's --

20    Q   So what other cases have you been involved in?

21    A   Let's see. I sued Milli Vanilli back in 1985, six,

22    seven, when they had their lip-synching thing.

23    Q   Uh-huh.

24    A   I joined the class action lawsuit against them. Won

25    $1.25.

Exhibit 1-Page 9

72

1   Q     All right.

2   A     So they settled.  There wasn't any fair debt collection

3   on that.  I think I sued somebody else.  No, I just threatened

4   to sue them.  Hold on.  Actual lawsuit.  I fought a bunch of

5   stuff in court but I didn't sue 'em.  Yeah.  No, that's all

6   I've sued for.  Yes.

7   Q     So you just said you've fought a lot of stuff in court

8   but haven't sued them.

9   A     Uh-huh.

10  Q     Which cases have you fought in court but --

11  A     Well, I got a criminal trespassing charge at Best Buy

12  because I went into Best Buy and this smart-aleck manager --

13  he was going to sell me some discounted equipment.  I said,

14  "Fine."  Okay?  So he says it's as is.  And I was, like, okay,

15  because it's outside the box and all that.

16  Q     Uh-huh.

17  A     And they did.  They cut me a pretty good deal on it.

18  However, at the time, they had the Geek Squad -- Best Buy did.

19  They had the Geek Squad.  And so the only thing was, I wanted

20  the Geek Squad to come over and hook everything up.

21        Well, when I called for the Geek Squad, the Geek Squad

22  said they didn't know what was going on and so I had the Geek

23  Squad and I had Best Buy.  They were pawning it off on each

24  other, throwing each other under the bus.  And here I had --

25  was a bunch of equipment that didn't work, didn't have any

Exhibit 1-Page 10

73

1    idea how to use it, and so I got mad.

2         So I took the equipment back.  I actually got a cart,

3    came out to my car, piled it all up on the cart, and rolled it

4    in there.

5         Well, the guy that was behind the counter, the manager,

6    he came out and said, "Hey, Buddy.  I already told you that's

7    as is."  I was, like, "Well, it's as is but we had the Geek

8    Squad in on this and the Geek Squad didn't even do it.  Geek

9    Squad wants, like, $150 to do this."  And I was, like, "And,

10   by God, I'm not gonna pay it.  Plus, I don't think the stuff

11   works."

12        And so there's -- Magnuson-Moss Warranty Act in 1972

13   still covers that.  It's -- there's still an implied warranty.

14   So, I was, like, you know, what?  I'm gonna return this stuff.

15   And I don't give a damn about your, you know, as is stuff.

16        Well, he didn't like that.  So I threatened to whoop his

17   ass.  So he told me to leave.  I left, but I sat out in the

18   parking lot and yelled.  I wanted him to come out.  So they

19   sent out some girl.  I wasn't gonna fight her.  They called

20   the police.  The police came.

21   Q    And when was this approximately?

22   A    In 2009ish, I think.

23   Q    Okay.

24   A    The police came, you know.  I mean, boys.  Guys being

25   guys, whatever, you know.  Go home.  You know, everybody go

Exhibit 1-Page 11

74

1    home.  Whatever.  Okay.  They said, "Leave."  I said, "Okay."

2    I left.

3         Well, cooler heads prevail.  In about three hours, I

4    mean, three days later, I load my stuff up in my buggy.  I go

5    in there all professional, cool, and calm and I'm gonna take

6    my stuff back.

7         Well, I'm over there -- they're ringing up the stuff.

8    They're over there gonna take it back.  I don't know.  Ten

9    minutes later, turn around, police officer.  "Are you Mr.

10   Scroggin?"  And I was, like, "Yeah."  "You come with me."  We

11   go outside.  Cop says, "Didn't we tell you to leave a few days

12   ago?"  I said, "Yeah, and I left."  They were, like, "But you

13   came back."  And I was, like, "Well, yeah.  I mean, I still

14   gotta return my stuff."  I said, "I'm not doing anything.  I'm

15   not violating the law or anything."  So they cited me for

16   criminal trespassing.

17        So, I'll be Dad-gummed, I said, "I'm not having any of

18   that."  So I represented myself.  Judge didn't want me to do

19   that either.  But I represented myself.  But here's the deal.

20   They said I wasn't supposed to come into their place and I had

21   probably 15 emails that said, "Brandon Scroggin, come in.

22   Here's $25 off your next order."  So they're telling me that

23   I'm not supposed to come into Best Buy while they're actually

24   sending me emails saying, "Hey, come on in."

25        So we got there at first, prosecutor's like, -- he's

Exhibit 1-Page 12

75

1    like, "Here, I'm gonna offer you this." And I said, "I don't

2    even want to hear your offer." So they asked for -- you know,

3    they did a continuance.

4         Next time they came, they had the cops there, they had

5    the manager of Best Buy there, bang the gavel, we're -- oh, I

6    forgot, too. I got charged with failure to appear on that

7    also because the first time I was supposed to go for plea and

8    arraignment on the criminal trespassing charge, I was hung

9    over and I didn't want to show up. And so I just got a

10   misdemeanor failure to appear. So I had a failure to appear

11   and then I had a criminal trespassing charge. So we're gonna

12   have a trial on both.

13        So prosecutor does his little song and dance. I got the

14   manager of Best Buy up there. So then I had all these 15

15   emails, you know. "Objection, hearsay." The judge was, like,

16   "Substain. [sic]" I was, like, "No, it goes to state of mind.

17   I'm not doing it for hearsay. I'm going to the state of mind

18   I have and this will establish a reasonable doubt on how I

19   reasonably assumed I was welcome into Best Buy. And we're not

20   in civil court, we're in criminal court." Substain [sic] for

21   that. I obviously beat the charge. I mean, not guilty on

22   that.

23        So they get ready to -- not guilty. The prosecutor rests

24   his case. However, I had a failure to appear. So I had a

25   failure to appear and I had a criminal trespassing. Well,

Exhibit 1-Page 13

1    they called both cases.  Blah, blah, blah.  The prosecutor

2    rested his case.  So he rested his case; found not guilty on

3    that.  Then he tried to say, "Okay.  Well, now we have a

4    failure to appear."

5        So I had the court reporter read back the record.  They

6    called it up.  Double jeopardy had attached, so I made an oral

7    motion for double jeopardy and got the failure to appear

8    dismissed for double jeopardy.  So I walked on both of 'em.

9        But it was a BS charge anyway.  The failure to appear, --

10   I should have shown up but it was just a -- and I turned

11   myself in on that.  I mean, I didn't get stopped or -- I mean,

12   I went down to the police station and turned myself in on

13   that; the failure to appear.  So I fought that.

14   Q    Now, did you sue Best Buy for causing you emotional

15   distress?

16   A    Yeah.  Well, I didn't sue 'em.  I didn't sue 'em.  I sent

17   'em a demand letter.

18   Q    Did they pay you some money?

19   A    $500.  Yeah.  Uh-huh.

20   Q    So let me get -- they paid you $500 for the distress of

21   kicking you out of their store, --

22   A    Uh-huh.

23   Q    -- having somebody --

24   A    Uh-huh.

25   Q    -- you know, not once but twice.  I mean, you were --

Exhibit 1-Page 14

84

1    A    No.

2    Q    So you don't plan to introduce any type of evidence like

3    that at trial?

4    A    No.  I don't keep a journal.

5    Q    Okay.  Do you write things down, like, electronically on

6    something?  Do you have an electronic calendar?

7    A    No.  No.  I mean, I post a lot on the internet, you know,

8    about stuff like this and things.  But I don't really keep a

9    journal.

10   Q    What do you post about on the internet about what stuff?

11   A    Oh, it's a consumer whatever you call it.  Rights.  Not

12   rights.  Debtor's website.  Consumer website.

13   Q    What's it called?

14   A    There's two of 'em.  One, I don't post on it very often.

15   It's called debtorsboard.com.

16   Q    Uh-huh.

17   A    Sue your creditor's and win.  And then we've got Credit

18   Info Center.  ww. -- www.creditinfocenter.com.  And I haven't

19   posted on Debtor's Board in over a year because they're more

20   arbitration focused.

21   Q    Uh-huh.

22   A    You know, to throw your predators out of court with

23   arbitration.  And I'm more of a court-type person so -- but

24   Credit Info Center, it's more geared toward debt collection

25   stuff.

Exhibit 1-Page 15

85

1    Q    Okay.   Now, under the -- do you -- how do you post?   You

2    make posts on the --

3    A    Yeah.   Uh-huh.   I'm coltfan1972.

4    Q    On both of them?

5    A    Yes.   And I've got a picture.   My Avatar is a picture of

6    a military guy with a gasmask on holding a big bazooka,

7    shooting it up a collector's ass that says, "I strenuously

8    object."

9    Q    Interesting.

10   A    Uh-huh.

11   Q    And so about how often do you post on these?

12   A    Oh, about 20 times a day.

13   Q    While you're at work?

14   A    Sometimes.

15   Q    So you enjoy the --

16   A    Oh, I help all kinds of people.   Yeah.   Yeah.   I enjoy

17   helping people and so I help people on there a lot from all

18   over the country.   We just got a guy in Wyoming that we

19   appealed his case all the way up to the Wyoming Supreme Court.

20   And the Wyoming Supreme Court just issued an order compelling

21   arbitration and overruled the District Court and the State

22   Court on that.

23   Q    Wow.

24   A    Yeah.   I helped him with his pro se motion on that in

25   Wyoming against Capital One.   Capital One, of course, dropped

Exhibit 1-Page 16

1    the lawsuit, of course, after that.  And I've helped several,

2    several, several people.  I helped a lady in Illinois in her

3    interlocutory appeal.  A guy in Florida.  I'm like the

4    Robinhood of debt collect -- you know, debtors.

5    Q    You consider yourself the Robinhood?

6    A    Yeah.  Uh-huh.  I'm doing a service.  I'm doing what the

7    second court -- I'm doing what the second Federal Court has

8    said.  The FDCPA encourages sophisticated consumers to sue

9    under the action that unsophisticated consumers could not

10   bring.  And for the deterrent effect it has for the

11   sophisticated consumers making sure that the unsophisticated

12   consumers are compensated for by the debt collectors not

13   wanting to risk running up against a sophisticated consumer.

14        And the primary mode of enforcement in the FDCPA is

15   private action by individuals acting as private attorney

16   generals.  And so I'm doing what the FDCPA has -- the

17   congressional and legislative attempt -- intent and what the

18   second Federal Court of Appeals has said when a debt collector

19   said that a debtor was acting like -- with unclean -- some

20   crap like unclean hands or something like that.  And so I'm

21   doing what the legislative intent was.

22   Q    Have you ever purposely defaulted on a debt just to see

23   if --

24   A    No.

25   Q    -- a collector would make a violation?

Exhibit 1-Page 17

87

1    A    No.

2    Q    Have you ever set up a collector to make a violation?

3    A    Well, no, you can't do that.  It's impossible.

4    Q    It's impossible to set up a collector?

5    A    Yeah.  Just strict liability statute.  Unsophisticated

6    consumer.  Regardless of the education of the consumer.  You

7    can't set a debt collector up.  It's impossible.

8    Q    Okay.  Now, have you suffered any -- well, what type of

9    actual harm have you suffered by my client?

10   A    The emotional distress we were talking about.

11   Q    So you had two anxiety attacks?

12   A    Okay.  There's anxiety and then there's anxiety attacks.

13   And when I talk about an anxiety attack, I'm using the legal

14   definition -- or not legal.  I'm using the medical definition

15   under a generalized anxiety disorder for an anxiety attack.

16   Then there's actual anxiety.  And then I would say there's an

17   anxiety attack, I would say there's anxiety, and then I would

18   say that there's just general being pissed off.

19        So your client caused me two anxiety attacks, a lot of

20   anxiety, and a whole lot of pissed off.  So that's my actual

21   damages.

22   Q    Okay.  Were you scared that something was going to happen

23   regarding this debt; that they were gonna come after you or

24   something?

25   A    No.  No.  I was embarrassed that my friend found out.

Exhibit 1-Page 18

1   No.  I'm not scared of debt collectors.  No.  Huh-uh.

2   Q    Okay.  Have you ever advised somebody on how to increase

3   their damages for emotional distress?

4   A    Yeah.

5   Q    Have you ever asked them -- you know, stated what

6   medications they should be --

7   A    No.  I've told them to go to the doctor and then when

8   they go to the doctor -- now, if they're having actual stress

9   and anxiety.  I don't say, "Hey, you need to go have some

10  stress and anxiety."  But if they're having stress and

11  anxiety, I tell them -- I do what I did to National Loan

12  Recoveries.  I tell them to go to the doctor and then when the

13  doctor or the nurses, you know, -- have you had any type of

14  events in your life, blah, blah, blah, I tell 'em instead of

15  just saying, "Yeah, I'm stressed," or whatever, make sure you

16  say -- be very specific because the nurse and the doctor --

17  they're writing this down on your chart.

18       So kind of like I did with National Loan Recovery.

19  Doctor asked me and I said, "Yeah.  I've got National Loan

20  Recoveries coming after me," and I explained my situation.  So

21  when National Loan Recoveries subpoenaed my medical records --

22  and so they were looking at 'em going uh-oh.  And so it's in

23  there.

24  Q    And you made sure to have it in there?

25  A    Hell, yeah.  Yeah.  Yeah.  You've gotta lay the

Exhibit 1-Page 19

89

1  foundation.  You gotta plant the seed.

2  Q    Exactly.  To get your damages up, right?

3  A    Right.  Right.  Kind of like a car wreck.  You know how

4  doctors -- I mean, kind of like chiropractors.  They'll, you

5  know, treat you or whatever.  But it needs to be legit.  Don't

6  get me wrong.  It needs to be legit.  I mean, I've never

7  advised somebody, "Hey, you know what -- ", you know.  It's

8  always been -- they've always brought it up and said, "Hey,

9  I'm really pissed off.  Hey, I'm mad.  My girlfriend got mad

10  at me or my parents heard this phone call."  Or, "I told this

11  debt collector to not call back and by God I'm shaking every

12  time the phone rings or I'm runnin' to the bathroom cryin',

13  you know, when the phone rings."  I've never just said, "Hey,

14  you know what?  Hey, oh, you got a collection letter.  Hey,--"

15  -- you know, like you, "Hey, Recca [sic]," you know.  "You

16  need to go to 'em.  You can go to wherever and say this or

17  that."  I've never done that.  No.

18  Q    Okay.  Let me see here.  Have you ever been involved in

19  bankruptcy?

20  A    Yes.

21  Q    When was that?

22  A    2003.

23  Q    And what type of bankruptcy was it?

24  A    It was dismissed.  I believe it was a Chapter 13.

25  Q    Why was it dismissed?

Exhibit 1-Page 20

1  A    Huh-uh.

2  Q    So when your -- when you made the offer, the $2,500 offer

3  to settle this case, was that made in good faith?

4  A    Oh, good Lord, yes.  I mean, that's a bargain.

5  Q    And that was made prior to filing suit?

6  A    Yeah.  Yeah.  I even sent the -- a copy of the law.  And

7  it clearly -- if you look at the letter it clearly states that

8  it's --

9  Q    Uh-huh.

10  A    -- this will be filed and it's an unfiled copy.

11  Q    So now that you've filed suit, that you're not willing to

12  settle for that amount?

13  A    No.  I'd be stupid.

14  Q    And now you have to consider attorney's fees, right, in

15  your --

16  A    Yeah.  That's the reason I got you was because I'm tired

17  of debt collectors just gettin' off easy by -- 'cause I can't

18  find a way to get attorney fees for myself.

19  Q    Okay.

20        MS. LEIGH:  I think -- (Speaking to Mr.

21    Koch) can you think of anything else?

22        That's all I've got.  Those are the issues I

23    wanted to touch on.

24        THE WITNESS:  Okay.

25        MS. LEIGH:  Thank you.

Exhibit 1-Page 21

1          **FURTHER EXAMINATION**

2     **BY MS. WORSHAM:**

3     Q     So anytime your rights get violated you're gonna have an

4     anxiety attack?

5     A     I would assume.  I mean, I can't say for sure.  I mean,

6     that's speculative.  I mean, but I would -- based on prior --

7     the way prior -- has happened prior, I would assume.

8     Q     Uh-huh.

9     A     But, I mean, it would be speculative to say absolutely

10    yes.  But probably so based on prior activity.  I would say

11    so.  Definitely a trigger.

12    Q     How many people would you say that you've helped online

13    sue their debt collector?

14    A     Here's the deal.  Sometimes I'll get the documents, you

15    know.  They'll say, "Hey, would you look at this?"  I got a

16    email -- I gotta walk a fine line of practicing law without a

17    license.  So I make sure I never take any compensation and I

18    make sure that there's a disclaimer, you know, under my Avatar

19    that says, "I am not a lawyer."  In fact, it's in big bold.

20    Q     Smart.

21    A     Right.  So probably some people probably don't, you know,

22    and say they do type of things.  So I'm just gonna go with

23    what I know by looking at documents and stuff and just being

24    able to go online and research cases and things like that.

25    And I'm gonna go with 75.

Exhibit 1-Page 22

103

1  Q    People?

2  A    No.  Not quite that many.  Let's go 70.  Seventy.

3  Q    People?

4  A    Yeah.

5  Q    And would those be 70 different cases you think or --

6  A    I would probably say --

7  Q    Or were they combined?

8  A    You know, most people were like me.  If you've got one

9  case you're gonna have more.  So I would probably say of those

10  70, I would say probably 70% of that 70 would be multiples.

11  So we could go with 30% of seven is 21.  So we could go with

12  21 different cases with 70 different people.  Now that's -- I

13  mean, that's a guess, but an educated guess.

14  Q    Okay.  All right.

15  A    We've never lost, I mean, if that's what you're asking.

16  Q    Well, that's great.

17  A    Yeah.  And we don't intend to ever do lose.

18  Q    'Cause you won't ever take a settlement unless they give

19  you a big chunk of change, right?

20  A    Exactly.  I'll go to court and get it that way.

21  Q    It doesn't matter if it's a waste of the judicial

22  economy --

23  A    Whoa.

24  Q    -- to you?

25  A    Are you --

Exhibit 1-Page 23

1    Q    I'm just asking.

2    A    Whoa.

3    Q    I'm just asking.

4    A    Wow.   The Second Court of Appeals and the legislative

5    intent is to do what I'm doing.

6    Q    Okay.

7    A    So I don't see anything is a waste.  And I have never

8    filed a lawsuit without making a reasonable demand prior to

9    filing the lawsuit.  And $2,500 is more than a reasonable

10   demand prior to filing a lawsuit.

11          Michael Clutho (phonetic), the attorney for Synerprise

12   Consulting, is the head attorney for the American Creditors

13   Association.  He also argued the germane case that says

14   bonafide error is not applicable into an error of law.  He

15   lost, of course.  So bonafide error can't be a mistake in the

16   law or a good faith.  Bonafide error, as the eighth circuit

17   has pointed out, can only be clerical errors.  So Michael

18   Clutho, who has over 800, at least on Pacer, has been involved

19   in 800 cases, two with the United States Supreme Court.

20          When he called me to settle, the only question was is

21   there an S on the end of Scroggin.  That's it.  There was no

22   hey, back and forth, it was where do we send the check and how

23   do you spell your last name.

24          So I don't consider it a waste.  I consider it a waste

25   when a client like yours plays hardball and thinks they can

Exhibit 1-Page 24

105

1  get over on a consumer that knows their rights and they drag

2  'em in here for a deposition on a strict liability statute

3  when obviously my lawsuit is full of United States Supreme

4  Court -- we just got a 19 -- we just got a ruling from the

5  United States Supreme Court on February 26th upholding the

6  communication -- this case that I cited in here, a

7  communication -- United States Supreme Court 72 had ruled that

8  is a communication under the FDCPA.  February 26th.

9  Q    Thank you for updating me on that.

10 A    I've got the case number if you'd like it; if you want to

11 write it down.  I brought it.

12 Q    I can research the law.  Thank you.

13 A    Well, I mean, I've got it here.  It's Mark [sic] versus

14 General Corporation, 2/26/2013, 11-1175, October 2012 term.

15      So the United States Supreme Court doesn't seem to have a

16 problem with anything I've gotten here so I don't see where

17 it's wasting time and it's the reason that the United States

18 Supreme Court has held up that attorney fees can only be

19 awarded if the case is brought in bad faith.  And obviously

20 you don't think the case is brought in bad faith 'cause you

21 didn't file a motion to dismiss.

22 Q    Well, then, you know everything don't you?

23 A    Yes.

24            MS. WORSHAM:  I have no more questions.  Thank

25            you, Mr. Scroggin.

Exhibit 1-Page 25

1          THE WITNESS:  You're welcome.

2          MS. LEIGH:  I do want to follow up, real quick.

3                    **FURTHER EXAMINATION**

4   BY MS. LEIGH:

5   Q    I want to clarify when you're talking about helping

6   people.  The definition -- can we define help?  I can only --

7   A    Help is providing resources of who --

8   Q    So you share your research?

9   A    Google Scholar, letting people know that if they get a

10  Pacer account -- that it's pretty cheap to get a Pacer account

11  where you can research federal cases.  So I tell 'em, "Hey,

12  look what the attorney has filed."

13  Q    So you might direct them to other websites or --

14  A    Right.  Right.

15  Q    -- share in the research that you've found?

16  A    And I can say, "Hey, look, this attorney --" --

17  Q    Okay.

18  A    -- "-- is suing you.  Look, they have boilerplate

19  complaints."  Or, "They've never handled an FDCPA case," or,

20  "They've only handled one FDCPA since 1993 and it was over a

21  rubbered [sic] stamp for a -- you know, an attorney's

22  signature and not,--" --

23  Q    Okay.

24  A    -- "-- you know, anything major."  Or, "The attorney has

25  only been in, like,--" --

Exhibit 1-Page 26

107

1  Q    So you can be real clear on that?

2  A    Yeah.  Employment law or something and not a FDCPA

3  attorney or something.

4  Q    All right.  Okay.

5              MS. LEIGH:  Thank you.

6              MS. WORSHAM:  Thank you.  That's it.

7              THE WITNESS:  Okay.  Thank you.

8              (WHEREUPON, the proceedings were concluded in

9         the matter at 12:10 p.m.)

10                   WITNESS EXCUSED

11             * * * * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1-Page 27

108

CERTIFICATE

STATE OF ARKANSAS      )

                           ) ss

COUNTY OF CRAIGHEAD    )


    I, Suzanne Veach, Certified Court Reporter #721, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.

    I FURTHER CERTIFY, that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

Exhibit 1-Page 28

WITNESS MY HAND AND SEAL THIS 6th day of March, 2013.


SUZANNE VEACH, CCR

Arkansas State Supreme Court
Certified Court Reporter #721

**SUZANNE VEACH**
**ARKANSAS SUPREME COURT**
**CERTIFIED COURT REPORTER**
**CERTIFICATE NO. 721**

Exhibit 1-Page 29